UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA MARIA SIMS,                :
                                    :
          Plaintiff                 :     No. 4:10-CV-1943
                                    :
     vs.                            :     (Complaint Filed 9/16/10)
                                    :
MICHAEL ASTRUE,                     :
COMMISSIONER OF SOCIAL              :     (Judge Munley)
SOCIAL SECURITY,                    :
                                    :
          Defendant                 :

<u>MEMORANDUM AND ORDER</u>

<u>BACKGROUND</u>

          The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Patricia Marie Sims's claim for social security
disability insurance benefits and supplemental security income
benefits.  For the reasons set forth below we will remand the
case to the Commissioner for further proceedings.

          Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It
is undisputed that Sims met the insured status requirements of
the Social Security Act through June 30, 2010. Tr. 9, 11 and

115.[1]

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

Sims was born in the United States on April 18, 1965. Tr. 89.  Sims graduated from high school in 1985 and can speak and understand the English language but has a limited ability to read and write. Tr. 48-50, 118 and 125.  Throughout her schooling Sims attended special education classes. Tr. 46 and 125.  Sims has past relevant employment[2] as a bakery worker which was described as unskilled, medium work by a vocational expert.[3] Tr.

---

1. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on November 29, 2010.

2. Past relevant employment in the present case means work performed by Sims during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

3. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

49.

Records of the Social Security Administration reveal
that Sims had earnings from January 1, 1995, through 2009, the
fifteen years prior to the date her claim was adjudicated, as
follows:

| | |
|---|---|
| 1995 | $ 10424.19 |
| 1996 | 10166.22 |
| 1997 | 9966.14 |
| 1998 | 7678.32 |
| 1999 | 14153.32 |
| 2000 | 13996.30 |

---

(b) *Light work*.  Light work involves lifting no more
than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds.  Even
though the weight lifted may be very little, a job is
in this category when it requires a good deal of
walking or standing, or when it involves sitting most
of the time with some pushing and pulling of arm or leg
controls.  To be considered capable of performing a
full or wide range of light work, you must have the
ability to do substantially all of these activities.
If someone can do light work, we determine that he or
she can also do sedentary work, unless there are
additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more
than 50 pounds at a time with frequent lifting or
carrying of objects weighing up to 25 pounds.  If
someone can do medium work, we determine that he or she
can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more
than 100 pounds at a time with frequent lifting or
carrying of objects weighing up to 50 pounds. If
someone can do heavy work, we determine that he or she
can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

| | |
|---|---|
| 2001 | 13404.58 |
| 2002 | 15643.86 |
| 2003 | 13272.09 |
| 2004 | 0.00 |
| 2005 | 18010.05 |
| 2006 | 2427.74 |
| 2007 | 3825.97 |
| 2008 | 0.00 |
| 2009 | 0.00 |

Tr. 94.  Sims's total earnings from 1995 through 2009 were $132,968.78.  Id.

Sims claims that she became disabled on October 7, 2005, as a result of an injury to her lower back sustained when she fell down "several stairs carrying an empty bucket" at work. Tr. 119 and 270.  After this injury Sims continued to work on a part-time basis and was then terminated from her job as a bakery worker in May, 2007, because of absenteeism related to the work injury and has not worked since that time.  Tr. 41-42, 102, 112 and 119.  After being terminated from her position as a part-time bakery worker, she lost her home and was homeless living in a tent for a period of time. Tr. 42-43.  After receiving a Workers' Compensation settlement, she purchased a trailer where she was living at the time the administrative hearing was held in this case.  Id.

Sims contends she suffers from debilitating pain in the lower back with radiation of the pain down her right leg. Tr. 27 and 31.  Sims claims that (1) she needs assistance from family members and friends to complete household maintenance and necessary shopping; (2) it takes approximately one hour in the morning before

4

her medications take hold and she is able to ambulate; (3) even with
her medications she is only able to stand and walk 10-15 minutes at
a time; (4) she has difficulty sitting more than 30 minutes at a
time; (5) she has difficulty lifting items weighing as little as 5
pounds; (6) during an average day, she must recline in a flat
position 3-4 times to ease her pain; and (7) during an average week,
she has 3-4 days when she is unable to complete even simple
activities. Tr. 28-33, 39 and 45.

     On October 1, 2007, Sims filed protectively[4] an
application for disability insurance benefits and an application for
supplemental security income benefits. Tr. 9, 56-57, 85-91 and 95-
96.  On January 22, 2008, the Bureau of Disability Determination[5]
denied Sims's applications. Tr. 59-68.  On February 26, 2008, Sims
requested a hearing before an administrative law judge. Tr. 71.
Approximately 13 months later, a hearing before an administrative
law judge was held on April 2, 2009. Tr. 20-55.  On September 22,
2009, the administrative law judge issued a decision denying Sims's
applications. Tr. 9-19.  On September 28, 2009, Sims requested that

---

4. Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

5. The Bureau of Disability Determination is an agency of the
Commonwealth of Pennsylvania which initially evaluates
applications for disability insurance benefits and supplemental
security income benefits on behalf of the Social Security
Administration.  Tr. 60 and 65.

the Appeals Council review the administrative law judge's decision and on July 10, 2010, the Appeals Council concluded that there was no basis upon which to grant Sims's request for review. Tr. 1-5 and 81-82.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On September 16, 2010, Sims filed a complaint in this court requesting that we reverse the decision of the Commissioner denying her social security disability insurance and supplemental security income benefits.  The Commissioner filed an answer to the complaint and a copy of the administrative record on November 29, 2010.  Sims filed her brief on January 13, 2011, and the Commissioner filed his brief on March 16, 2011.  The appeal[6] became ripe for disposition on March 25, 2011, when Sims filed a reply brief.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact

---

6. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

6

pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial

evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

8

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[7] (2) has an impairment that is severe or a combination of impairments that is severe,[8] (3) has an

---

7. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

8. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which

impairment or combination of impairments that meets or equals the requirements of a listed impairment,[9] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must

---

significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

9. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

determine the claimant's residual functional capacity. Id.[10]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

The administrative record in this case which primarily consists of medical records is 392 pages in length and we have thoroughly reviewed that record.  The medical records reveal that Sims was treated for problems with her lower back.

The record reveals that after sustaining an injury to her back Sims continued to work as a bakery worker periodically on a part-time basis until May, 2007, when her employment was terminated. Tr. 252, 255, 256, 258 and 260.  The administrative law judge in his decision which we will review in detail *infra* found that Sims "has

---

10. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

not engaged in substantial gainful activity[11] since October 7,
2005." Tr. 11.

After sustaining the injury to her back on October 7,
2005, Sims was treated on a regular basis for approximately 20
months by Mark W. Scinico, M.D., at Northeastern Medical Center,
Wilkes-Barre, Pennsylvania. Tr. 270.  Dr. Scinico limited Sims to
part-time work until April 16, 2007, with functional restrictions.
Specifically, in March 2006, Dr. Scinico limited Sims to "the
sedentary occasional demand level with no prolonged sitting or
standing positions, no climbing and no repetitive bending." Tr. 269.
In October, 2006, Dr. Scinico limited Sims to no repetitive bending,
climbing, overhead work, or lifting more than "the light demand
level." Tr. 260.  In addition to limiting Sims to part-time work
with varying functional restrictions, there were occasions during
the time Sims was being treated by Dr. Scinico that Dr. Scinico
stated that Sims was "not able to work." Tr. 275 and 276.  Dr.
Scinico during the course of his treatment of Sims prescribed
physical therapy, a TENS unit[12] and several pain medications,

---

11. Substantial gainful activity is work that "involves doing
significant and productive physical or mental duties" and "is
done (or intended) for pay or profit."  20 C.F.R. § 416.910.  In
order to amount to substantial gainful activity the individual's
earnings have to rise to at least a minimum level set by
regulations of the Social Security Administration.

12. "TENS" is an abbreviation for transcutaneous electrical nerve
stimulation.  A TENS unit is a battery powered device used to
send electrical impulses to certain parts of the body to block
pain signals. Tens Unit Website, http://www.tensunits.com/ (Last

including Vicodin, Skelaxin, Ultram, Motrin and Oxycontin.[13]  Tr.
261, 264, 269 and 276.  Physical therapy records during the time
Sims was treated by Dr. Scinico reveal very little improvement and
sometimes a worsening of Sims's condition.[14] Tr. 148-149, 151-152,
156 and 163-166.

On May 14, 2007, Sims was examined for the last time by
Dr. Scinico. Tr. 252-253.  Prior to that examination Dr. Scinico
reviewed a report of an independent medical examination performed by
William R. Prebola, Jr., M.D., a non-treating physician who was
retained by the company that employed Sims and was defending a claim
filed by Sims for workers' compensation benefits. Tr. 367-382.  The
actual report prepared by Dr. Prebola is not contained within the
administrative record.  However, a copy of Dr. Prebola's deposition

---

accessed September 16, 2011).

13. Vicodin, a combination of acetaminophen and hydrocodone, is a
narcotic pain reliever.  Vicodin, Drugs.com, http://www.drugs.com
/vicodin.html (Last accessed September 16, 2011). Skelaxin is a
muscle relaxant and used to treat musculoskeletal pain. Skelaxin,
Drugs.com, http://www.drugs.com/skelaxin.html (Last accessed
September 16, 2011).  Ultram is a narcotic-like pain reliever.
Ultram, Drugs.com, http://www.drugs.com/ultram.html (Last
accessed September 16, 2011). Motrin is a nonsteroidal anti-
inflammatory drug used to treat pain and inflammation. Motrin,
Drugs.com, http://www.drugs.com/motrin.html (Last accessed
September 16, 2011).  Oxycontin is a narcotic pain medication
similar to morphine. Oxycontin, Drugs.com, http://www.drugs.com
/oxycontin.html (Last accessed September 16, 2011).

14.  A physical therapy record of January 3, 2006, reveals that
Sims "display[ed] decreased lumbar spine [active range of
motion], decreased lower extremity strength with increased pain
and increased functional limitations" in comparison to the
initial physical therapy evaluation of October 17, 2005. Tr. 156.

taken as part of a workers' compensation proceedings is contained within the administrative record. Id.  Dr. Scinico in his report of Sims's last appointment stated that he "reviewed Dr. Prebola's IME and he found multiple inconsistencies on examination.  He noted no spasm and [full range of motion] without focal neuromotor deficits. Based on review of his report, he indicated that there was a full recovery." Tr. 252.

Dr. Scinico after examining Sims on May 14, 2007, told Sims that her "examination is benign today" and released Sims "to regular work on a full-time basis" but noted "I will re-evaluate her in 3-4 weeks, if needed.  I have given her Oxycontin 10 tablets one p.o.[15] daily until they are finished.  Only 20 tablets.  I will not give her any refills.  This is only based on the fact that she advised me that she is taking them twice daily and, indeed, I would not want her to undergo withdrawal symptoms."[16]  Tr. 252-253.

In August, 2007, Sims had an appointment with James M. Jiunta, D.O., who maintains "a practice in osteopathic medicine and surgery with a concentration in family and occupational medicine for the last 22 years in Wilkes-Barre, Pennsylvania." Tr. 362.  Dr.

15. "P.O." is an abbreviation for "per os" meaning by mouth.

16. Sims in her reply brief has stated that "Dr. Scinico was a panel physician affiliated with the Plaintiff's employer with whom she was required to treat as a condition of her Workers' Compensation claim." Doc. 14, Plaintiff's Reply Brief, p. 2.  Our review of the record reveals that Dr. Scinico  divided his treatment notes of Sims into non-work related clinic notes and work-related clinic notes. Tr.  279 and 280.

Jiunta's resume reveals that he is on the staff of Wilkes-Barre Mercy Hospital and General Hospital and was the director of the occupational medicine program at Mercy Hospital from July, 1985, to August, 2000. Id.   He is also a clinical instructor as a member of the clinical faculty of the Philadelphia College of Osteopathic Medicine, New England College of Osteopathic Medicine and the Kansas College of Osteopathic Medicine.[17] Tr. 363.

Dr. Jiunta's physical examination of Sims on August 14, 2007, revealed deep tendon reflexes in the lower extremities of "+2/4 at the patellar bilaterally and +1/4 at the Achilles bilaterally" and "[d]ullness to pinprick in the L4-5, L5-S1 distribution of the right leg. . . slight decrease in strength in the right leg compared to the left . . . some paralumbar spasm noted on the right more than the left. . . [and] pain with palpation of

---

17. The University of Maryland Medical Center website indicates that

> [a] doctor of osteopathic medicine (D.O.) is a physician licensed to practice medicine, perform surgery, and prescribe medication.
>
> Information:
>
> Like allopathic physicians (or M.D.s), osteopathic physicians complete 4 years of medical school and can choose to practice in any speciality of medicine. However, osteopathic physicians receive an additional 300-500 hours in the study of hands-on manual medicine and the body's musculoskeletal system.

http://www.umm.edu/ency/article/002020.htm (Last accessed September 16, 2011).

the right sacroiliac joint." Tr. 297.  Dr. Jiunta's assessment was
that Sims suffered from the following conditions:(1) possible
herniated disc secondary to a work-related injury, (2) L4-5 and L5-
S1 radiculopathy, (3) right leg weakness and (4) right sacroiliac
joint pain. Id.  Dr. Jiunta ordered a EMG/nerve conduction study and
an MRI of Sims's lumbar spine. Id.  He also prescribed Skelaxin,
Ultracet and Celebrex.[18] Id.  The MRI was performed on August 17,
2007, and revealed the following: "1. Right paramedian disc
herniation L5-S1. 2. Dessication without disc herniation at L1-L2,
L2-L3, and L3-L4. 3. Mild lower thoracic disc degeneration
identified at the periphery of the field of view." Tr. 306.  The
EMG/nerve conduction study also performed on August 27, 2007,
revealed a "normal study" and  "no electrophysiological evidence of
diffuse polyneuropathy, myopathy or lumbosacral radiculopathy."
(Emphasis added.)[19]

On September 25, 2007, Sims had a follow-up appointment
with Dr. Jiunta. Tr. 293.  In the report of that appointment Dr.
Jiunta stated as follows:

---

18. Ultracet, a drug used to treat moderate to severe pain, is a
combination of tramadol and acetaminophen.  Tramadol is a
narcotic pain medication. Ultracet, Drugs.com, http://www.drugs.
com/ultracet.html (Last accessed September 16, 2011).  Celebrex
is a nonsteroidal anti-inflammatory drug used to treat pain and
inflammation. Celebrex, Drugs.com, http://www.drugs.com/
celebrex.html (Last accessed September 16, 2011).

19. As will be explained shortly, a normal study and the lack of
electrophysiolgical evidence does not rule out the possibility
that an individual suffers from a radiculopathy.

> Previous MRI of her back showed L5-S1 disc herniation. We did evaluate her on 08-14-07 and felt she should have an EMG/nerve conduction study and repeat MRI of the lumbar spine.  Her EMG was negative.  Her MRI done 8-17-07 shows right paramedian disc herniation at L5-S1.  She is in chronic pain at this point in time. . . This is despite Skelaxin, Ultracet and Celebrex. . . She needs surgical intervention. She's been through pain management and injection therapy without help.

Tr. 293.  Dr. Jiunta's physical examination of Sims revealed that she weighed 234 pounds and was "profoundly obese." Tr. 293.  He further stated that deep tendon reflexes in the lower extremities were "+2/4 at the patellar bilaterally and +1/4 at the Achilles bilaterally" and there was "[d]ullness to pinprick in the L4-5, L5-S1 distribution of the right leg. . . slight decrease in strength in the right leg compared to the left . . . some paralumbar spasm noted on the right more than the left. . . [and] pain with palpation of the right sacroiliac joint." Tr. 294.  Dr. Jiunta's assessment was that Sims suffered from the following conditions:(1) herniated L5-S1 disc with right leg weakness, (2) right sacroiliac joint pain, and L5-S1 radiculopathy in the right leg.  Id.  Dr. Jiunta in the "Plan" section of his report stated that the MRI revealed a disc herniation and that Sims needed surgery. Id.  Dr. Jiunta referred Sims to Carlo De Luna, M.D.,[20] a neurosurgeon, at Penn State Hershey Medical Center for an evaluation. Id.  Dr. Jiunta further advised Sims to

---

20. As will be revealed *infra* Sims was evaluated by Akash Agarwal, M.D., a neurosurgeon and colleague of Dr. De Luna at Hershey Medical Center.  The administrative record does not contain any information on the background and experience of Dr. Agarwal.

continue with her current medications. <u>Id.</u>

On October 3, 2007, Sims was evaluated by Akash Agarwal, M.D., at the Hershey Medical Center. Tr. 298-305.  Dr. Agarwal's physical examination of Sims revealed that Sims was 5 feet 1 inch tall and weighed 230 pounds, Sims had pain on palpation over the lower spine, and degenerative disc disease throughout her lumbar spine.  Tr. 304.  Dr. Agarwal stated in his report that he

> explained to [Sims] again that she appears to have a slight right L5-S1 disc herniation which may be causing some of her leg pain. However, I do not believe that this is the cause of her back pain . . . Again, I have explained to [Sims] that a surgical operation to decompress the nerve at the right side L5-S1 level would potentially help with the leg pain, but however, I do not guarantee that her leg pain and her back pain would be improved. It is very unlikely that her back pain would improve with a surgical procedure.  Again, I have explained to her that I do not see <u>any evidence</u> of any radiculopathy <u>on her EMG study</u> as this does not demonstrate any evidence of any nerve root radiculopathy. At this time, I recommend that she continue with physical therapy including aquatherapy and electrostimulation. She can reconsider steroid injections.  However, I do not feel that decompression of her right L6-S1 (sic) nerve root would help with her predominant symptom of low back pain.  I also explained to and expressed to her that given her weight this may also be contributing to her mechanical low back pain.  I think many of her symptoms are paraspinous and mechanical in nature.

<u>Id.</u> (Emphasis added.)  At a deposition held on October 26, 2007, in the workers' compensation proceedings, Dr. Jiunta testified that he basically agreed with Dr. Agarwal's assessment, although incorrectly referring to him as Dr. De Luna, and also explained his finding that Sims suffered from lumbar radiculopathy.  Dr. Jiunta testified as follows:

Q. Doctor, your second visit, which I believe was your last visit to date, when was that?

A.  9/25/07.

Q.  Did you take an updated history?

A.  Yes.

Q.  Can you reveal that, please?

A.  Yes.  She again had lumbar back pain.  I did have the benefit at this visit of her previous MRI . . . and this showed an L-5, S-1 disk herniation.  And we did do an EMG and a nerve conduction study that was done also on 8/27/07.  I had that report, also, at this visit and that was deemed a normal study without evidence of radiculopathy.  And I did review those with the patient.

   And I did review the MRI with the patient that was done on 8/17/07 that showed right paramedian disk herniation at L-5, S-1.

*   *   *   *   *   *   *   *   *   *   *

Q.  With regard to your physical, did you do a physical on that second exam, 9/25/07?

A.  Yes, I did.  And, again, with regard to the orthopedic and neurologic evaluation of this patient, neurologically, she continued to have . . . reflexes that were diminished at 1/4 and dullness to pinprick in the L-4-5 and L-5, S-1 distribution in the right leg and decreased strength in the right leg compared to the left . . .

   Basically, my exam was unchanged.  From a spinal standpoint, she still had paralumbar spasm in the right and pain with palpation to the right sacroiliac joint.

Q.  Had your impression changed at all, Doctor?

A.  No, they had not changed at all.

Q.  Now, I see that – looking at the impressions on the 9/25/07 note itself – you continued to list L-5, S-1 radiculopathy on the right leg.  You testified earlier

19

the EMG study that came back and nerve conduction study
was normal?

A.   Correct.

Q.   You still maintain that diagnosis, however?

A.   Yes, I do. Because of the sensory loss and the
weakness to the leg, yes, from a clinical standpoint,
she does have radiculopathy.

Q.   Is an EMG, Doctor, in your opinion – can you have
a radiculopathy and a normal EMG study?

A.   Yes, you can.  Yes, you can.  I have seen it
multiple times over the years.

Q.   Is an EMG, in your opinion, a necessary tool to
diagnose her radiculopathy?

A.   No.

Tr.  344-346.  The administrative record contains no medical

evidence contrary to the opinion expressed by Dr. Jiunta that a

normal EMG/nerve conduction study does not rule out a finding that a

patient is suffering from a radiculopathy.

With regard to Dr. Agarwal's assessment Dr. Jiunta

(although as noted previously incorrectly referring to Dr. Agarwal

as Dr. De Luna) testified in pertinent part as follows:

Q.   You don't have to get into great detail but bottom
line it for us, did Dr. DeLuna think that she was a
surgical candidate?

*   *   *   *   *   *   *   *   *   *   *

A.   In Dr. Deluna's discussion in the report he did
send to me, he explained to her that she has an L-5,
S-1 disk herniation and that it may be causing her right
leg pain but he didn't believe this was the cause of her
back pain.  And I agree, I think that the back pain is
probably coming from facet joint arthrosis.

20

And he explained to her that to operate and decompress the nerve would potentially help the leg pain but probably would not do anything for the back pain, which I agree with that statement, also.

And he tends to be more conservative and he did not feel that decompression of her L-5, S-1 nerve root would help with the symptoms of her back pain. But, again, I think that her pain is multifactorial and, you know, she may need to have some of that leg pain and a partial amount of that back pain removed with surgery and then maybe some injection therapy to the facets to alleviate the remainder of the pain.

Tr. 349-350. An x-ray of the lumbar spine completed on September 25, 2007, revealed "mild degenerative disk disease[21] and facet

---

21. Degenerative disc disease has been described as follows:

As we age, the water and protein content of the cartilage of the body changes. This change results in weaker, more fragile and thin cartilage. Because both the discs and the joints that stack the vertebrae (facet joints) are partly composed of cartilage, these areas are subject to wear and tear over time (degenerative changes). The gradual deterioration of the disc between the vertebrae is referred to as degenerative disc disease. Wear of the facet cartilage and the bony changes of the adjacent joint is referred to as degenerative facet joint disease or osteoarthritis of the spine.

Degeneration of the disc is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae.

Degenerative Disc Disease & Sciatica, MedicineNet.com, http://www.medicinenet.com/degenerative_disc/page2.htm (Last accessed September 15, 2011). Degenerative disc disease is considered part of the normal aging process. Id.

Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. Radiculopathy is

arthrosis." Tr. 295.

## DISCUSSION

Sims argues that the administrative law judge erred at step two of the sequential evaluation process when he found that Sims's only medically determinable impairment was degenerative disc disease of the lumbar spine, that the administrative law judge erred at step three of the sequential evaluation process in finding that her impairments did not meet or equal the requirements of a listed impairment, and that the administrative law judge erred at step four of the sequential evaluation when he found that Sims had the residual functional capacity to perform sedentary work. We need not address Sims's claim that the administrative law judge erred at step three because the administrative law judge committed errors at steps two and four of the sequential evaluation process and those errors impact the administrative law judge's assessment of Sims's credibility.

The administrative law judge went through each step of the sequential evaluation process and (1) found that Sims had not engaged in substantial gainful activity since October 7, 2005, the

a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com /radiculopathy/article.htm (Last accessed September 12, 2011). A herniated disc is one cause of radiculopathy. Id. Radiculopathy is a step beyond degenerative disc disease and severe cases may requires surgical intervention. Id. However, "the majority of patients respond well to conservative treatment options." Id.

alleged disability onset date; (2) found that Sims had the severe
impairment of "degenerative disk disease of the lumbar spine;" (3)
found that Sims's impairments did not meet or equal a listed
impairment; (4) found that Sims lacked credibility; (5) rejected the
opinion of a treating physician James M. Jiunta, D.O., who concluded
that Sims suffered from lumbar radiculopathy in addition to
degenerative disc disease; and (6) concluded that Sims could not
perform her past relevant work but that she could perform a limited
range of sedentary work. Tr. 11-18.  Specifically, the
administrative law judge stated that Sims could engage in full-time
sedentary work as defined in the regulations including

> lifting between eight (8) and ten (10) pounds
> occasionally, five (5) pounds frequently, sitting for
> approximately six (6) out of eight (8) hours.  A
> sit/stand option is needed and, at best, the
> operating of foot controls should be less than
> frequent, to more in the occasional range. Further,
> claimant would not ever be suitable for climbing
> ladders, scaffolds or ropes or actually descending
> them either.  Ramps and stairs should only be taken
> on an occasional basis, perhaps emergent. Balancing
> can be done, at least occasionally. Activities such
> as stooping, crouching, kneeling and crawling would
> have to drop below occasional.  However, there are no
> issues with the range of motion in claimant's neck per
> se.  Further, there are no limitations, per testimony,
> with respect to use of the hands for reaching, overhead
> reaching, handling, fingering, grasping, gross dexterous
> motor coordination or fine motor manipulation. However,
> the claimant would not be able to tolerate any ambulation
> over uneven terrain or prolonged ambulation.  Due to her
> chronic condition of bronchitis, the claimant would not be
> able to deal with dramatic changes between cold and heat,
> extreme cold or heat, or work in atmospheres where there
> would be a concentrated exposure to respiratory irritants.
> From a cognitive processing level, the claimant should not
> work around automotive machinery, which does not mean

23

assembly lines, per se, but does mean moving vehicles and the like, as the claimant may have the inability to appreciate hazards.  Further, she should be restricted from performing work at unprotected heights.  If there are any communication requirements in the workplace, they should be oral and of a very limited nature.  The claimant is not someone suitable to make workplace judgments independently, and likewise is not able to perform any workplace decision-making, and she would not be tolerant of changes in work settings of any frequent nature.  In the truest sense, claimant can perform very rudimentary, repetitive tasks.

Tr. 12-13.  At the administrative hearing, the administrative law judge asked the vocational expert to consider an individual with the above residual functional capacity and Sims's educational and work background and identify jobs which that individual could perform. The vocational expert identified in the northeastern region of Pennsylvania the jobs of hand packer (900 positions), sorter, tagger, folder (cumulative total 800 positions), and assembler (1000 positions). Tr. 18.  Based on that testimony, the administrative law judge found that Sims was not disabled because she could perform those jobs, and that there were a significant number of such jobs in the national economy. Id.

     Sims argues that the administrative law judge erred by failing to acknowledge all of Sims's medically determinable impairments established by the record.  This argument has substantial merit.  The administrative law judge erroneously concluded that Sims did not suffer from lumbar radiculopathy and failed to address Sims's obesity in accordance with regulations of the Social Security Administration.

24

The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520©.  If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two.  However, all of the medically determinable impairments both severe and non-severe must be considered at step two when determining which impairment is or impairments in combination are severe, and at step four when setting the residual functional capacity.  The social security regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

The administrative law judge erroneously stated that there was "no objective clinical evidence to corroborate claimant's complaints of lumbar and leg pain." Tr. 15.  The record reveals uncontested evidence - Dr. Jiunta's treatment notes and testimony – that Sims suffers from lumbar radiculopathy.  The failure of the

25

administrative law judge to find that condition as a medically determinable impairment makes his decision at steps two and four of the sequential evaluation process defective.

The record also reveals that Sims weighed 230 pounds and was 5'1" tall.  An individual of such height and weight has a body mass index of 43.5 and is considered morbidly obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc.gov/healthyweight/assessing/bmi/a dult_bmi/english_bmi_calculator/bmi_calculator.html (Last accessed September 14, 2011). "Doctors often use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese. Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when [the person has] a BMI of 40 or more. With morbid obesity, [the person is] especially likely to have serious health problems." Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www.mayoclinic.com/health/obesity/ DS00314 (Last accessed September 14, 2011).

Social Security Ruling 02-1p states that "we consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. . . the combined effects of obesity with other impairments can be greater than the effects of each impairment considered separately.. . adjudicators [are] to consider the effects of obesity not only

under the listings but also when assessing a claim at other steps of
the sequential evaluation process, including when assessing an
individual's residual functional capacity."  The ruling further
states that

> [a]n assessment should also be made of the effect obesity
> has upon the individual's ability to perform routine
> movement and necessary physical activity within the work
> environment.  Individuals with obesity may have problems
> with the ability to sustain a function over time. . .
> our [residual functional capacity] assessments must
> consider an individual's maximum remaining ability to do
> sustained work activities in an ordinary work setting on
> a regular and continuing basis.  A "regular and continuing
> basis" means 8 hours a day, for 5 days a week, or an
> equivalent work schedule. In cases involving obesity,
> fatigue may affect the individual's physical and mental
> ability to sustain work activity. . . The combined effects
> of obesity with other impairments may be greater than
> might be expected without obesity.  For example, someone
> with obesity and arthritis affecting a weight-bearing
> joint may have more pain and limitation than might be
> expected from the arthritis alone.

The administrative law judge at step two of the sequential
evaluation process did not address Sims's obesity as required by
Social Security Ruling 02-1p.

The errors at steps two and four of the sequential
evaluation process, draw into question the administrative law
judge's residual functional capacity determination and assessment of
the credibility of Sims.  The administrative law judge found that
Sims's medically determinable impairments could reasonably cause
Sims's alleged symptoms but that Sims's statements concerning the
intensity, persistence and limiting effects of those symptoms were
not credible.  This determination by the administrative law judge

was based on an incomplete analysis of all of Sims's medically
determinable impairments.

The administrative law judge also inappropriately focused
on the disagreement between Dr. Jiunta and Dr. Agarwal regarding
Sims's need for surgery and inappropriately judged the
qualifications of Dr. Jiunta by stating he was a mere osteopath
"with no specialized training in the diagnosis, care and treatment
of lumbar disorders and surgical intervention." Tr. 15.  The record
refutes this finding.  Furthermore, "[i]n this day and age there is
no basis to find one medical practitioner to be more credible than
another merely because one has the letters "D.O." after his name and
the other has the letters "M.D." after his name." Weller v. Astrue,
Civil No. 08-1765, slip op. at 30 (M.D. Pa. March 16, 2009)(Muir,
J.)

The administrative record reveals that the decision of the
Commissioner is not supported by substantial evidence.  We will,
therefore, pursuant to 42 U.S.C. § 405(g) vacate the
decision of the Commissioner and remand the case to the Commissioner
for further proceedings.

An appropriate order will be entered.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge


28

Dated: September 23, 2011

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA MARIA SIMS,                    :
                                        :
          Plaintiff                     :     No. 4:10-CV-1943
                                        :
      vs.                               :     (Complaint Filed 9/16/10)
                                        :
MICHAEL ASTRUE,                         :
COMMISSIONER OF SOCIAL                  :     (Judge Munley)
SOCIAL SECURITY,                        :
                                        :
          Defendant                     :

ORDER

     In accordance with the accompanying memorandum, **IT IS**
**HEREBY ORDERED THAT:**

     1.   The Clerk of Court shall enter judgment in favor of
Patricia Maria Sims and against Michael J. Astrue, Commissioner of
Social Security, as set forth in the following paragraph.

     2.   The decision of the Commissioner of Social Security
denying Patricia Maria Sims supplemental security income benefits is
vacated and the case remanded to the Commissioner of Social Security
to:

     2.1 Conduct a new administrative hearing  and
appropriately evaluate the medical and vocational evidence and the
credibility of Patricia Maria Sims in accordance with the background
of this order.

30

    3.   The Clerk of Court shall close this case.


                <u>s/ James M. Munley</u>
                JAMES M. MUNLEY
                United States District Judge

Dated: September 23, 2011